1  James F. Speyer (SBN 133114)
   James.Speyer@arnoldporter.com
2  ARNOLD & PORTER KAYE SCHOLER LLP
3  777 South Figueroa Street, 44th Floor
   Los Angeles, California  90017-5844
4  Phone: (213) 243-4000 / Fax:  (213) 243-4199

5

6  Attorneys for Plaintiff 7-Eleven, Inc.

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11

| | |
|---|---|
| 7-ELEVEN, INC.,<br><br>             Plaintiff,<br><br>        vs.<br><br>GURTAR SANDHU AND SSS REALM<br>CORPORATION,<br><br>        Defendants. | Case No.  8:24-cv-490<br><br>**COMPLAINT**<br><br>1. Lanham Act - Trademark Infringement<br>2. Lanham Act - Unfair Competition<br>3. Lanham Act - Trademark Dilution<br>4. Breach of Post-Termination Obligations<br>5. Recovery of Chattels Subject to Security Interest<br>6. Ejectment<br>7. Breach of Franchise Agreements<br>8. Breach of Guaranty |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 1 -
COMPLAINT

Plaintiff 7-Eleven, Inc. (**"7-Eleven"**) sues Defendants Gurtar Sandhu ("**Mr. Sandhu**") and SSS Realm Corporation ("**SSS Realm**"), and alleges:

## **Introduction**

1.      This action arises out of Defendants' pervasive and systemic fraudulent use of tobacco promotions, their repeated breaches of the franchise agreements they entered into with 7-Eleven, and the potential their conduct has to harm 7-Eleven's goodwill and image.  As set forth more fully below, 7-Eleven has learned that, in violation of their obligations under the parties' franchise agreements, Defendants have engaged in hundreds of fraudulent transactions involving tobacco product promotions.  Defendants' actions are tantamount to stealing from the tobacco manufacturers, and their unethical conduct goes to the very heart of the parties' franchise relationship.

2.      For these and the additional reasons set forth below, including their repeated breaches of their contractual obligations and their conduct which reflected materially and unfavorably upon the operation and reputation of the franchise business and 7-Eleven's franchise system, 7-Eleven terminated Defendants' franchise agreements.  However, Defendants refuse to comply with their post-termination obligations under those agreements, including their obligations to (i) cease all use of 7-Eleven's trademarks, and (ii) turn possession of the premises of their former franchised 7-Eleven® stores over to 7-Eleven.

3.      By this action, 7-Eleven seeks, among other things, possession of the premises of Defendants' former franchised 7-Eleven® stores, a preliminary and permanent injunction enjoining Defendants' wrongful and unlawful use of 7-Eleven's federally registered trademarks, damages for Defendants' infringing and other wrongful conduct, and the attorneys' fees and costs it has incurred and will incur in prosecuting this action.

## **Parties**

4.      7-Eleven is a corporation organized and existing under the laws of the state of Texas with its principal place of business in Irving, Texas.

5.      Mr. Sandhu is an individual residing in and a citizen of San Bernardino County, California.

6.      SSS Realm is a corporation organized and existing under the laws of the state of California with its principal place of business in Orange County, California.

## Jurisdiction and Venue

7.      Subject matter jurisdiction in this matter is founded upon 15 U.S.C. § 1121 and 29 U.S.C. §§ 1331 and 1338. The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

8.      The Court also has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the parties to this action are diverse and the amount in controversy exceeds $75,000.00.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants operate the businesses that are the subject of this action in this District. Additionally, a substantial part of the events giving rise to this action occurred in this District.

## 7-Eleven's System and Registered Marks

10.      7-Eleven is an operator and franchisor of convenience store retail businesses.

11.      7-Eleven evolved from an ice company in the 1920s that began selling milk, eggs, and bread from an improvised storefront. The company's stores were originally known as "Tote'm Stores" but in 1946 the name of the stores was changed to "7-Eleven" to reflect the hours of operation—7 a.m. to 11 p.m.—and that name has been in continuous use since.

12.      7-Eleven has developed methods and procedures, called a "system," used in the operation of convenience store businesses. 7-Eleven's system is a comprehensive business format for the establishment and operation of high-standard convenience store businesses with distinctive features in products, services, distribution, accounting, training, and management assistance.

13.    7-Eleven's system is the culmination of decades of 7-Eleven's experience and investment of resources into its development and refinements.

14.    To identify the source, origin, and sponsorship of 7-Eleven® convenience stores and the services they offer, and to distinguish its convenience stores and associated products and services from those offered and sold by others, 7-Eleven has extensively used trademarks and service marks (the "**7-Eleven Marks**"), including without limitation:

| Mark | Registration Number | Effective Date |
|---|---|---|
| 7-ELEVEN | 718,016 | 7/4/1961 |
| 7-ELEVEN | 920,897 | 9/21/1971 |
| OH THANK HEAVEN FOR 7-ELEVEN | 1,008,307 | 1/17/1978 |
| SLURPEE | 829,177 | 7/8/1967 |
| BIG GULP | 1,110,172 | 12/26/1978 |
| 7-ELEVEN LOGO AND DESIGN | 896,654 | 8/11/1970 |

15.    The 7-Eleven Marks are registered on the Principal Register of the United States Patent and Trademark Office. The registrations continue in full force and effect and all those eligible are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

16.    7-Eleven has given notice to the public of the registration of the 7-Eleven Marks as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that 7-Eleven and its authorized licensees remain the exclusive users of the 7-Eleven Marks.

17.    The 7-Eleven Marks, including the trade dress of red, orange, and green striping against a white field, are often part of the building structure in 7-Eleven® stores and inseparable from its realty. Even functional components of the equipment used in 7-

Eleven® stores, such as fountain backsplashes and point-of-sale register terminals, contain the 7-Eleven® Marks.

18.    7-Eleven has continuously used the 7-Eleven Marks in interstate commerce in connection with the promotion and licensing of 7-Eleven® convenience stores and the services they offer throughout the United States, including in the State of California, since the date of their registration.

19.    The services offered by 7-Eleven and its licensees under the 7-Eleven Marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including in the State of California.

20.    7-Eleven has extensively advertised and promoted 7-Eleven® convenience stores and the services they offer under the 7-Eleven Marks throughout the United States and world, expending enormous resources and millions of dollars in advertising and other efforts to obtain and retain recognition and customer association of the 7-Eleven® marks with 7-Eleven® stores and speed, convenience, and quality.

### 7-Eleven® Franchising

21.    7-Eleven has been franchising since the 1960s and most of its United States stores are franchised. Through written franchise agreements, 7-Eleven licenses the use of its marks and its system of operating convenience stores to others, subject to the terms and conditions of those agreements, many of which serve to  protect 7-Eleven's image and brand.

22.    In exchange, a 7-Eleven® franchisee must pay to 7-Eleven a defined percentage of its gross profit (net sales less cost of goods sold), called the 7-Eleven Charge.

23.    Other salient features of the 7-Eleven® franchise system include:

A.    The Open Account: 7-Eleven extends financing to its franchisees for use in the operation of franchised stores. The amount financed by 7-Eleven and the balance due from its franchisee is maintained in an account defined in the franchise

agreement as the "Open Account." Essentially, the Open Account is a running working capital account that carries the outstanding balance that 7-Eleven has loaned to the franchisee. In exchange for the financing provided by 7-Eleven, the franchisee grants a security interest to 7-Eleven in, among other things, the store's inventory and proceeds.

B.    <u>Retail Information Systems</u>: 7-Eleven® franchisees must use a proprietary Retail Information System computer system and software having various point-of-sale, inventory management, and back-office functions. Through this Retail Information System, a franchisee reports virtually all store transactions to 7-Eleven, including sales, inventory acquisitions and adjustments, payroll, etc.

C.    <u>Inventory Reporting & Accounting</u>: A franchisee can finance its purchase of store inventory through the Open Account or purchase inventory with cash. In either instance, the franchisee is obligated to report the inventory transaction and submit the related invoice to 7-Eleven.

D.    <u>Cash Reports</u>: 7-Eleven® franchisees must prepare and transmit to 7-Eleven a daily cash report ("Cash Report"). Among other things, the Cash Report sets forth the daily sales and whether those sales were for cash or credit. The Cash Report also accounts for deductions from cash receipts that affect the daily deposit, such as a franchisee's cash payment to a vendor to acquire merchandise for sale in the store.

E.    <u>Minimum Net Worth</u>: Most 7-Eleven® franchised stores must maintain a "Minimum Net Worth" of $10,000 or $15,000 depending on the date of their franchise agreement. A

franchisee's "Net Worth" is essentially the sum total of its assets minus its liabilities. The Minimum Net Worth requirement is intended to protect 7-Eleven's investment in the store, its exposure for the Open Account, and to assure that 7-Eleven® franchisees are financially vested in the operation of their stores.

F.   <u>Monthly Financials</u>:   7-Eleven prepares monthly financial reports called "Financial Summaries" for each store from its bookkeeping records that accumulates and sorts the information reported to it concerning the franchisee's store operations, such as sales, expenses, inventory acquisitions, and paid-in capital contributions. The Financial Summaries include, among other things, an income statement, balance sheet, and calculation of the Open Account balance and Net Worth calculated in accordance with the provisions of the franchise agreement.

**The Parties' Written Franchise Agreements**

24.   On or around December 31, 2018, SSS Realm entered into a franchise agreement, ancillary agreements, and addenda (collectively, the "**24132 Franchise Agreement**") for the operation of 7-Eleven® Store No. 24132, located at 17920 S. Avalon Blvd in Carson, California ("**Store 24132**"). A true and correct copy of the 24132 Franchise Agreement is attached as **Exhibit A**.

25.   Mr. Sandhu, as the sole owner of SSS Realm, executed a Principals' Guaranty and Assumption Agreement (the "**24132 Guaranty**"), guaranteeing the payment and performance of SSS Realm's obligations under the 24132 Franchise Agreement. A copy of the Guaranty is included in the document titled "Entity Franchisee Amendment to Franchise Agreement" that is appended to the 24132 Franchise Agreement.

26.     Also on or around December 31, 2018, SSS Realm entered into a franchise agreement, ancillary agreements, and addenda (collectively, the "**34535 Franchise Agreement**") for the operation of 7-Eleven® Store No. 34535, located at 8600 S. Central Avenue in Los Angeles, California ("**Store 34535**"). A true and correct copy of the 34535 Franchise Agreement is attached as **Exhibit B**.

27.     Mr. Sandhu, as the sole owner of SSS Realm, executed a Principals' Guaranty and Assumption Agreement (the "**34535 Guaranty**"), guaranteeing the payment and performance of SSS Realm's obligations under the 34535 Franchise Agreement. A copy of the Guaranty is included in the document titled "Entity Franchisee Amendment to Franchise Agreement" that is appended to the 34535 Franchise Agreement.

28.     On or around December 31, 2018, SSS Realm entered into a franchise agreement, ancillary agreements, and addenda (collectively, the "**35639 Franchise Agreement**") for the operation of 7-Eleven® Store No. 35639, located at 1800 E. Slauson Avenue in Los Angeles, California ("**Store 35639**").[1] A true and correct copy of the 35639 Franchise Agreement is attached as **Exhibit C**.

29.     Mr. Sandhu, as the sole owner of SSS Realm, executed a Principals' Guaranty and Assumption Agreement (the "**35639 Guaranty**"), guaranteeing the payment and performance of SSS Realm's obligations under the 35639 Franchise Agreement. A copy of the Guaranty is included in the document titled "Entity Franchisee Amendment to Franchise Agreement" that is appended to the 35639 Franchise Agreement.

30.     Each Franchise Agreement was a renewal of an existing franchise relationship.

31.     Prior to franchising Store 24132, Store 34535, and Store 35639 (collectively, the "**Stores**"), 7-Eleven had selected each store's location, acquired the

---

[1]  The 24132 Franchise Agreement, 34535 Franchise Agreement, and 35639 Franchise Agreement are collectively referred to herein as the "**Franchise Agreements**."

properties, and made physical improvements to the premises. 7-Eleven also outfitted the Stores with equipment needed for the operation of convenience stores, such as coolers, soda fountains, grills, a safe, cash registers, and so on (the "**Equipment**").

32.    The Stores' premises and Equipment are leased to SSS Realm through the Franchise Agreements.

33.    The lease provisions of the Franchise Agreements contain exclusive use clauses. The purpose of these clauses is to ensure that only a 7-Eleven® business is operated on premises where 7-Eleven has made these investments, that is, on real property it owns or has acquired via a long-term lease from a third party so that locational goodwill is retained and 7-Eleven property is used only for its intended purpose: to operate and use as a 7-Eleven® store.

34.    7-Eleven also provided financing to SSS Realm including financing for the Stores' inventory. Store inventory and other assets are subject to security interests in 7-Eleven's favor, which secure all indebtedness of SSS Realm to 7-Eleven.

35.    SSS Realm agreed in the Franchise Agreements, among other things, to (a) maintain a high ethical standard in the operation of the Stores (Section 19(a)); (b) properly record sales of Inventory at the time of sale (Section 19(f)); (c) provide 7-Eleven with actual sales data and truthful information (Section (12(c)); and (d) not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, or any of 7-Eleven's rights in or to its marks, image, or the 7-Eleven system (Section (23(d)).

36.    SSS Realm further agreed in Section 4(d) of the Franchise Agreement to comply with all mandatory standards, specifications, operating procedures and other material contained in 7-Eleven's Operations Manual.  In the Operations Manual, SSS Realm agreed to comply with the terms of any promotions that it opted-into, and that it would not use manufacturer retail promotions for anything other than retail sales.  SSS Realm acknowledged that its failure to comply with the manufacturer program limitations

would hurt 7-Eleven's standing with manufacturers and would affect 7-Eleven's ability to obtain manufacturer cost support programs in the future.

37.     SSS Realm also agreed in Section 26(a)(1) of the Franchise Agreements that 7-Eleven could immediately terminate the Franchise Agreements, without providing SSS Realm with an opportunity to cure, if SSS Realm made any material misrepresentation or omission in connection with SSS Realm's operation of the Stores.

38.     SSS Realm further agreed in Section 26(a)(10) of the Franchise Agreements that 7-Eleven may terminate the Franchise Agreements immediately, and without providing SSS Realm with an opportunity to cure, if SSS Realm failed on four (4) or more separate occasions within any twenty-four (24) consecutive month period to comply with the terms of the Franchise Agreements, whether or not SSS Realm corrected the failures after 7-Eleven's delivery of notice to SSS Realm.

### **Defendants' Tobacco Promotions Fraud**

39.     The Stores came to the attention of 7-Eleven's asset protection team because sales data reported by SSS Realm reflected an above average use of promotional discounts and manufacturer's coupons.

40.     The excessive and statistically unusual transactions prompted an investigation by 7-Eleven, which uncovered an alarming pattern of fraud occurring at the Stores.  Defendants routinely falsified sales of tobacco products and then applied manufacturer's coupons or promotions to the sham transactions to collect the financial incentives for Defendants.

41.     7-Eleven's investigation included a review of the Stores' point-of-sale ("**POS**") data and security camera video corresponding to numerous discount transactions at the Stores.

42.     At Store 24132, for example, 7-Eleven reviewed one hundred and forty-one (141) coupon and promotion transactions from November 11, 2021 through May 31, 2023, and ninety-six (96) of those transactions involved fraud.  In other words, SSS

Realm falsified sixty-eight percent of the coupon and promotion transactions 7-Eleven viewed at Store 24132 during that time period.

43.     Defendants carried out their scheme by scanning tobacco products through the POS touchscreen register and then scanning coupons or applying digital promotions to reduce or eliminate the balance of the transaction.

44.     Defendants' false reporting of tobacco sales and bogus coupon redemption sometimes occurred without any customer at the counter, no merchandise leaving the Store, and no money or coupons either being collected or placed in the register drawer.

**Examples of Defendants' Promotions Fraud at Store 24132**

45.     An example of Defendants' dishonest conduct at Store 24132 occurred on November 19, 2021 at 10:29 a.m., when SSS Realm falsely reported an NJOY promotion transaction:

- A male sales associate believed to be store manager Saidy Sarabia rang a transaction with a customer present. The store manager scanned an NJOY product. The store manager scanned twelve (12) NJOY ACE devices for $299.88 and a BIC Lighter for $2.49. An NJOY promotional discount was then applied to the transaction for $288.00. The store manager gave the customer five (5) cigars. The remaining balance of the transaction was $15.84 (with tax). The customer paid with a debit card and only left with five (5) cigars.  No NJOY merchandise left the Store.

46.     The below image was taken from Store 24132's security system at around 10:29 a.m. on November 19, 2021, and shows SSS Realm process the fraudulent transaction. A reproduction of the sales receipt is also pictured below.





47.    SSS Realm performed another fraudulent transaction on December 6, 2021 at 11:39 a.m. when it falsified another NJOY transaction:

- A male sales associate believed to be store manager Saidy Sarabia rang a transaction with a customer present. The store manager scanned five (5) NJOY products for $124.95. An NJOY promotional discount was applied to the transaction for $120.00. The remaining balance of the transaction was $5.46 (with tax). The customer paid with cash and only left with five (5) cigars. No NJOY merchandise left the Store.

48.    The below image was taken from Store 24132's security system at around 11:39 a.m. on December 6, 2021 and shows SSS Realm perform the fraudulent transaction. A reproduction of the sales receipt is also pictured below.



49.     SSS Realm's fraud continued around two months later on February 4, 2023 at 9:38 a.m. when it fabricated and reported to 7-Eleven an ON! promotion transaction:

- An unknown female sales associate rang a transaction with a customer present. The customer presented three (3) packs of Michelob Ultra to the sales associate at the register.  The sales associate hand keyed nine (9) ON! Original 4mg packs for $59.31. An ON promotional discount was applied to the transaction for $26.31. The remaining balance of the transaction was $36.38 (with tax). The customer paid with cash and only left with three (3) packs of Michelob Ultra. No ON! merchandise left the Store.

50.     The below image was taken from Store 24132's security system at around 9:38 a.m. on February 4, 2023, and shows SSS Realm complete the fraudulent transaction.  A reproduction of the sales receipt is also pictured below.




51.    SSS Realm's fraud continued a few hours later, when at 2:51 p.m. on February 4, 2023, it fabricated and reported to 7-Eleven another ON! promotion transaction:

- An unknown female sales associate rang a transaction with a customer present.  The sales associate hand keyed six (6) ON! Original 4 mg packs for $39.54, a 3 pack of Michelob Ultra for $7.99 and 20 Tyson Buffalo wings for $33.80.  An ON! promotional discount was applied to the transaction for $17.54. The remaining balance of the transaction was $54.90 (with tax). The customer paid with cash and only left with three 3 packs of Michelob Ultra and 20 Tyson Buffalo wings. No ON! merchandise left the Store.

52.    The below image was taken from Store 24132's security system at around 2:51 p.m. on February 4, 2023, and shows SSS Realm complete the fraudulent transaction.  A reproduction of the sales receipt is also pictured below.



53.    SSS Realm's fraud continued months later, when at 11:41 a.m. on October 1, 2023, it fabricated and reported to 7-Eleven a Newport promotion transaction:

- An unknown sales associate rang a transaction without a customer present.  The sales associate hand keyed four (4) Newport cigarette cartons for $414.80 and two (2) B&M cigars for $2.38.  A Newport promotional discount was applied to the transaction for $410.80.  The sales associated completed the transaction as a cash transaction. No Newport merchandise left the Store.

54.    The below image was taken from Store 24132's security system at around 11:41 a.m. on October 1, 2023, and shows SSS Realm complete the fraudulent transaction.  A reproduction of the sales receipt is also pictured below.



55.    SSS Realm's fraud continued a few weeks later, when at 1:35 p.m. on October 26, 2023, it fabricated and reported to 7-Eleven a JUUL and Old Wisconsin promotion transaction:

- An unknown sales associate rang a transaction without a customer present.  The sales associate hand keyed three (3) JUUL products for $56.97 and two (2) Old Wisconsin Smokes for $7.98.  A JUUL promotional discount of $52.50 was applied to the transaction and an Old Wisconsin promotion of $6.98 was applied to the transaction.  The sales associate completed the transaction as a cash transaction, but no cash was placed in the register. No JUUL or Old Wisconsin merchandise left the Store.

56.    The below image was taken from Store 24132's security system at around 1:35 p.m. on October 26, 2023, and shows SSS Realm complete the fraudulent transaction.  A reproduction of the sales receipt is also pictured below.



57.    On February 26, 2024, at 3:18 p.m., SSS Realm fabricated and reported to 7-Eleven another ON! promotion transaction:

- An unknown sales associate scanned nine (9) ON! products for $59.31. An ON! promotional discount of $32.31 was applied to the transaction. The customer paid with a debit card and left the Store with only one e-cigarette item.

58.    The below image was taken from Store 24132's security system at around 3:18 p.m. on February 26, 2024, and shows SSS Realm complete the fraudulent transaction.  A reproduction of the sales receipt is also pictured below.



59.     The next day, on February 27, 2024, at 1:22 p.m., SSS Realm fabricated and reported to 7-Eleven another ON! promotion transaction:

- An unknown sales associate scanned nine (9) ON! products for $59.31. An ON! promotional discount of $32.31 was applied to the transaction. The customer paid with a debit card and left the Store with only one e-cigarette item.

60.     The below image was taken from Store 24132's security system at around 1:22 p.m. on February 27, 2024, and shows SSS Realm complete the fraudulent transaction.  A reproduction of the sales receipt is also pictured below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16    61.    SSS Realm's fraud continued a few hours later that same day, on February

17  27, 2024, at 9:29 p.m., when it fabricated and reported to 7-Eleven another ON!

18  promotion transaction:

19          • An unknown sales associate scanned six (6) ON! products for $39.54

20              and two (2) Cheerios Cereal Cups for $5.58.  An ON! promotional

21              discount of $21.54 was applied to the transaction.  The customer paid

22              with a debit card and left the Store with a black beanie and a black pair

23              of gloves.

24    62.    The below image was taken from Store 24132's security system at around

25  9:29 p.m. on February 27, 2024, and shows SSS Realm complete the fraudulent

26  transaction.  A reproduction of the sales receipt is also pictured below.

27
28



**Examples of Defendants' Promotions Fraud at Store 35639**

63.     An example of Defendants' dishonest conduct at Store 35369 occurred on February 26, 2024 at 1:36 p.m., when SSS Realm falsely reported an ON! promotion transaction:

- A sales associate rang a transaction for eight (8) ON! products totaling $52.72, one "Grow 2 Grow" juice for $5.49, and ten (10) Ice Cups for $8.57. An ON! promotional discount of $21.54 was applied to the transaction. The customer paid with cash and left with only two e-cigarette items and the "Grow 2 Grow" juice.

64.     The below image was taken from Store 35369's security system at around 1:36 p.m. on February 26, 2024, and shows SSS Realm process the fraudulent transaction. A reproduction of the sales receipt is also pictured below.



65.    Defendants' misconduct continued the next day on February 27, 2024, at 5:18 p.m.:

- A sales associate rang a transaction for twelve (12) ON! products totaling $79.08, four (4) large Slurpees for $9.16, and two (2) pizza slices for $3.98.  An ON! promotional discount of $43.08 was applied to the transaction, along with a pizza promotional discount of $2.17.  The customer paid with a debit card and left with only two e-cigarette items.

66.    The below image was taken from Store 35369's security system at around 5:18 p.m. on February 27, 2024, and shows SSS Realm process the fraudulent transaction. A reproduction of the sales receipt is also pictured below.

67.    Defendants' misconduct continued a few hours later on February 27, 2024, at 9:12 p.m., when they fabricated an ON! promotion transaction:

- A sales associate rang a transaction for twelve (12) ON! products totaling $79.08 and four (4) large Slurpees for $9.16. An ON! promotional discount of $43.08 was applied to the transaction. The customer paid with a debit card and left with only two e-cigarette items.

68.    The below image was taken from Store 35369's security system at around 9:12 p.m. on February 27, 2024, and shows SSS Realm process the fraudulent transaction. A reproduction of the sales receipt is also pictured below.



### The Volume Of Defendants' Fraudulent Conduct

69.    The volume of Defendants' misconduct is staggering. The charts below illustrate the prolific and cumulative nature of Defendants' deceit as it relates to a single tobacco manufacturer, NJOY!:

### NJOY Tobacco Products -- By Dollar

### (January 1, 2020 - November 30, 2022)

|  | Inventory Cost | Reported Retail Sales | Variance | Promotion |
|---|---|---|---|---|
| **Store 24132** | ($319) | $59,242 | ($59,561) | $56,547 |
| **Store 34535** | $1,847 | $47,003 | ($45,156) | $44,472 |
| **Store 35639** | $3,737 | $13,305 | ($9,568) | $9,116 |
| **Total** | $5,265 | $119,550 | ($114,285) | $110,135 |

70.    In sum, SSS Realm's Stores reported $114,285 more sales of NJOY products than the Stores had in reported inventory. These bogus sales were supported by thousands of dollars in promotional funding from the NJOY manufacturer.  Just in the case of NJOY products, the fraudulently obtained funding was over $104,800.00.

71.    7-Eleven likewise concluded from similar statistical information and its personal observations of additional transactions at SSS Realm's Stores that Defendants also engaged in the same unethical scheme regarding promotions for ON! and JUUL products.

### <u>Termination of the Franchise Agreements</u>

72.    On March 6, 2024, 7-Eleven delivered to SSS Realm numerous separate notices of material breach for each of SSS Realm's Stores based on its repeated failures to accurately record sales of Inventory at the time of sale, provide actual sales data and truthful information to 7-Eleven, operate the Stores in a manner that did not adversely affect 7-Eleven, other 7-Eleven franchisees, or the 7-Eleven Marks, Image, or System, and comply with the Operations Manual by only using manufacturer promotions for retail sales.

73.    On March 6, 2024, 7-Eleven also delivered to SSS Realm three separate Notices of Material Breach and Termination (the "**Termination Notices**") for each Store based on its unethical conduct in the operation of the Stores.  True and correct copies of the Termination Notices are attached as **Exhibit D**.

74.    As set forth in the Termination Notices, 7-Eleven terminated the Franchise Agreements because (i) SSS Realm's fraud was uncurable and went to the heart of the parties' franchise relationship, (ii) SSS Realm's fraud reflected materially and unfavorably upon the operation and reputation of the franchise business and 7-Eleven's franchise system, and (iii) SSS Realm's repeated breaches of the Franchise Agreement. 7-Eleven also terminated the Franchise Agreements pursuant to Section 26(a)(1), as a result of SSS Realm making material misrepresentations in connection with its operation of the Stores.

75. In the Termination Notices, 7-Eleven declared SSS Realm's subleases and Equipment leases terminated and demanded that SSS Realm comply with its post-termination obligations under the Franchise Agreements, including that it quit the premises and deliver possession to 7-Eleven and transfer the Stores' inventory to it.

76. By separate notice, 7-Eleven also discontinued its financing of the Open Account and, per the terms of the Franchise Agreements, accelerated and declared immediately due and payable the entire balances.

### Defendants' Violations of the Post-Termination Covenants and Infringement

77. Notwithstanding the Franchise Agreements' termination and 7-Eleven's demands for possession of the Stores' premises and Equipment, Defendants continue to operate the Stores and falsely hold them out to the consuming public as authorized and duly licensed 7-Eleven® stores.

78. To protect itself, 7-Eleven has advised its vendors that the stores operated by Defendants are no longer 7-Eleven®, despite their appearance otherwise, and that Defendants are not authorized to carry or purchase 7-Eleven's proprietary brands.

79. The Stores' conditions and operations will deteriorate as time progresses because Defendants cannot comply with 7-Eleven's system.

80. There is no reasonable way for a customer to know that Defendants' stores are not authorized to use 7-Eleven's marks and not associated with the 7-Eleven® system. By all appearances, the Stores remain, and their premises appear to be, 7-Eleven® stores, although they are not.

81. It is impractical if not impossible for Defendants to sufficiently separate the distinguishing characteristics of the Stores from 7-Eleven. Consequently, unless Defendants are prohibited from continuing their operations, 7-Eleven's brand and image are at risk and will be impaired by a customer's negative views and association of experiences at the Stores' locations with the 7-Eleven® brand.

82. 7-Eleven is prevented from making productive use of its own property as a consequence of Defendants' conduct. In particular, Defendants have no right of

continued possession of the premises or Equipment following termination of the Franchise Agreements.

83.    All conditions precedent to bringing this suit have occurred, have been satisfied, or have been waived.

84.    7-Eleven has at all times complied with and fully performed all of its obligations under the Franchise Agreements.

## COUNT I

### Lanham Act - Trademark Infringement (Store 24132)

85.    7-Eleven realleges paragraphs 1-84 above.

86.    The marks being used by Defendants at Store 24132 are identical to 7-Eleven's marks.

87.    Defendants offer identical goods to the public and move in identical channels of trade as 7-Eleven and duly licensed 7-Eleven® franchisees.

88.    Defendants' use of 7-Eleven's marks at Store 24132 is without any oral or written consent of 7-Eleven and is likely to cause mistake or confusion in the minds of the public in violation of 15 U.S.C. § 1114(1)(a).

89.    Defendants' actions charged above are being done knowingly and intentionally to cause confusion, mistake, or to deceive.

90.    Defendants have profited from their acts of infringement and 7-Eleven has suffered damages.

91.    7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation, and goodwill of 7-Eleven and its authorized franchisees, such that damages alone cannot adequately compensate for Defendants' misconduct.

92.    Unless enjoined, Defendants and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent

Defendants' continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

### COUNT II

### Lanham Act - Trademark Infringement (Store 34535)

93.    7-Eleven realleges paragraphs 1-84 above.

94.    The marks being used by Defendants at Store 34535 are identical to 7-Eleven's marks.

95.    Defendants offer identical goods to the public and move in identical channels of trade as 7-Eleven and duly licensed 7-Eleven® franchisees.

96.    Defendants' use of 7-Eleven's marks at Store 34535 is without any oral or written consent of 7-Eleven and is likely to cause mistake or confusion in the minds of the public in violation of 15 U.S.C. § 1114(1)(a).

97.    Defendants' actions charged above are being done knowingly and intentionally to cause confusion, mistake, or to deceive.

98.    Defendants have profited from their acts of infringement and 7-Eleven has suffered damages.

99.    7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation, and goodwill of 7-Eleven and its authorized franchisees, such that damages alone cannot adequately compensate for Defendants' misconduct.

100.    Unless enjoined, Defendants and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

### COUNT III

### Lanham Act - Trademark Infringement (Store 35639)

101.    7-Eleven realleges paragraphs 1-84 above.

- 27 -

**COMPLAINT**

102.   The marks being used by Defendants at Store 35639 are identical to 7-Eleven's marks.

103.   Defendants offer identical goods to the public and move in identical channels of trade as 7-Eleven and duly licensed 7-Eleven® franchisees.

104.   Defendants' use of 7-Eleven's marks at Store 35639 is without any oral or written consent of 7-Eleven and is likely to cause mistake or confusion in the minds of the public in violation of 15 U.S.C. § 1114(1)(a).

105.   Defendants' actions charged above are being done knowingly and intentionally to cause confusion, mistake, or to deceive.

106.   Defendants have profited from their acts of infringement and 7-Eleven has suffered damages.

107.   7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation, and goodwill of 7-Eleven and its authorized franchisees, such that damages alone cannot adequately compensate for Defendants' misconduct.

108.   Unless enjoined, Defendants and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

## <u>COUNT IV</u>

### Lanham Act - Unfair Competition (Store 24132)

109.   7-Eleven realleges paragraphs 1-84 above.

110.   Defendants' use of 7-Eleven's marks along with any colorable variation thereof at Store 24132 constitutes a passing off of the goods of Defendants as those of 7-Eleven in violation of 15 U.S.C. § 1125(a).

111.   By reason of the foregoing, 7-Eleven is substantially injured in its business, including harm to the goodwill associated with its marks.

112.   Defendants' actions charged above are being done knowingly and intentionally to cause confusion, mistake, or to deceive.

113.   7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation, and goodwill of 7-Eleven and its authorized franchisees, such that damages alone cannot adequately compensate for Defendants' misconduct.

114.   Unless enjoined, Defendants and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

## COUNT V

### Lanham Act - Unfair Competition (Store 34535)

115.   7-Eleven realleges paragraphs 1-84 above.

116.   Defendants' use of 7-Eleven's marks along with any colorable variation thereof at Store 34535 constitutes a passing off of the goods of Defendants as those of 7-Eleven in violation of 15 U.S.C. § 1125(a).

117.   By reason of the foregoing, 7-Eleven is substantially injured in its business, including harm to the goodwill associated with its marks.

118.   Defendants' actions charged above are being done knowingly and intentionally to cause confusion, mistake, or to deceive.

119.   7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation, and goodwill of 7-Eleven and its authorized franchisees, such that damages alone cannot adequately compensate for Defendants' misconduct.

120.   Unless enjoined, Defendants and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent

Defendants' continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

## COUNT VI

### Lanham Act - Unfair Competition (Store 35639)

121.   7-Eleven realleges paragraphs 1-84 above.

122.   Defendants' use of 7-Eleven's marks along with any colorable variation thereof at Store 35639 constitutes a passing off of the goods of Defendants as those of 7-Eleven in violation of 15 U.S.C. § 1125(a).

123.   By reason of the foregoing, 7-Eleven is substantially injured in its business, including harm to the goodwill associated with its marks.

124.   Defendants' actions charged above are being done knowingly and intentionally to cause confusion, mistake, or to deceive.

125.   7-Eleven is without an adequate remedy at law because its marks are unique and represent to the public the identity, reputation, and goodwill of 7-Eleven and its authorized franchisees, such that damages alone cannot adequately compensate for Defendants' misconduct.

126.   Unless enjoined, Defendants and those acting in concert with them will continue to use and infringe upon 7-Eleven's marks. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of 7-Eleven's marks and to ameliorate and mitigate the harm being caused to 7-Eleven.

## COUNT VII

### Lanham Act - Trademark Dilution (Store 24132)

127.   7-Eleven re-alleges paragraphs 1 through 84 above.

128.   The marks being used by Defendants at Store 24132 are identical to the 7-Eleven Marks.

129.   Defendants offer identical goods to the public and move in identical channels of trade as 7-Eleven and duly licensed 7-Eleven® franchisees.

130.   Defendants' acts, practices and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy or colorable imitation of the 7-Eleven Marks, and Defendants' sale, offering for sale, distribution or advertising of non-conforming goods and services under the 7-Eleven Marks causes dilution of the distinctive quality of the 7-Eleven Marks, in violation of 15 U.S.C. §1125(c).

131.   As a direct and proximate result of Defendants' trademark dilution, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

132.   7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation and goodwill, such that damages alone cannot fully compensate 7-Eleven for Defendants' misconduct.

133.   Unless enjoined by the Court, Defendants will continue to use and dilute the 7-Eleven Marks, to 7-Eleven's irreparable injury.  This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued dilution of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT VIII

### Lanham Act - Trademark Dilution (Store 34535)

134.   7-Eleven re-alleges paragraphs 1 through 84 above.

135.   The marks being used by Defendants at Store 34535 are identical to the 7-Eleven Marks.

136.   Defendants offer identical goods to the public and move in identical channels of trade as 7-Eleven and duly licensed 7-Eleven® franchisees.

137.   Defendants' acts, practices and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy or colorable imitation of the 7-Eleven Marks, and Defendants' sale, offering for sale, distribution or advertising of non-conforming goods and services under the 7-Eleven Marks causes dilution of the distinctive quality of the 7-Eleven Marks, in violation of 15 U.S.C. §1125(c).

138.   As a direct and proximate result of Defendants' trademark dilution, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

139.   7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation and goodwill, such that damages alone cannot fully compensate 7-Eleven for Defendants' misconduct.

140.   Unless enjoined by the Court, Defendants will continue to use and dilute the 7-Eleven Marks, to 7-Eleven's irreparable injury.   This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued dilution of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## <u>COUNT IX</u>

### Lanham Act - Trademark Dilution (Store 35639)

141.   7-Eleven re-alleges paragraphs 1 through 84 above.

142.   The marks being used by Defendants at Store 35639 are identical to the 7-Eleven Marks.

143.   Defendants offer identical goods to the public and move in identical channels of trade as 7-Eleven and duly licensed 7-Eleven® franchisees.

144.   Defendants' acts, practices and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy or colorable imitation of the 7-Eleven Marks, and Defendants' sale, offering for sale, distribution or advertising of non-conforming goods and services under the 7-Eleven Marks causes dilution of the distinctive quality of the 7-Eleven Marks, in violation of  15 U.S.C. §1125(c).

145.   As a direct and proximate result of Defendants' trademark dilution, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

146.   7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation and goodwill, such that damages alone cannot fully compensate 7-Eleven for Defendants' misconduct.

147.   Unless enjoined by the Court, Defendants will continue to use and dilute the 7-Eleven Marks, to 7-Eleven's irreparable injury.   This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Defendants' continued dilution of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT X

**Breach of Post-Termination Obligations (24132 Franchise Agreement)**

148.   7-Eleven realleges paragraphs 1-84 above.

149.   7-Eleven and SSS Realm are parties and signatories to the 24132 Franchise Agreement.

150.   7-Eleven has complied with its obligations under the 24132 Franchise Agreement.

151.   SSS Realm has breached the 24132 Franchise Agreement's post-termination obligations by, among other things:

    A.   Failing to surrender Store 24132 and the Equipment;

    B.   Failing to transfer to 7-Eleven Store 24132's inventory; and

    C.   Failing to cease using the 7-Eleven marks and system.

152.   As a direct and proximate result of these breaches, 7-Eleven has been substantially and irreparably injured.

153.   7-Eleven is being deprived of the beneficial use of its real property and Equipment, and its business identity, customer and locational goodwill and reputation are impaired by SSS Realm's conduct and continued possession. SSS Realm is exacerbating this harm by operating and holding out its business as a 7-Eleven® store, when they are not.

154.   7-Eleven is without an adequate remedy at law to address this harm and protect its interests, and until SSS Realm is ordered to abide by the post-termination promises it made to 7-Eleven, 7-Eleven will continue to suffer substantial, irreparable injury to its business and reputation.

<u>**COUNT XI**</u>

**Breach of Post-Termination Obligations (34535 Franchise Agreement)**

155.   7-Eleven realleges paragraphs 1-84 above.

156.   7-Eleven and SSS Realm are parties and signatories to the 34535 Franchise Agreement.

157.   7-Eleven has complied with its obligations under the 34535 Franchise Agreement.

158.   SSS Realm has breached the 34535 Franchise Agreement's post-termination obligations by, among other things:

      D.    Failing to surrender Store 34535 and the Equipment;

      E.    Failing to transfer to 7-Eleven Store 34535's inventory; and

      F.    Failing to cease using the 7-Eleven marks and system.

159.   As a direct and proximate result of these breaches, 7-Eleven has been substantially and irreparably injured.

160.   7-Eleven is being deprived of the beneficial use of its real property and Equipment, and its business identity, customer and locational goodwill and reputation are impaired by SSS Realm's conduct and continued possession. SSS Realm is exacerbating this harm by operating and holding out its business as a 7-Eleven® store, when they are not.

161.   7-Eleven is without an adequate remedy at law to address this harm and protect its interests, and until SSS Realm is ordered to abide by the post-termination promises it made to 7-Eleven, 7-Eleven will continue to suffer substantial, irreparable injury to its business and reputation.

<u>**COUNT XII**</u>

**Breach of Post-Termination Obligations (35639 Franchise Agreement)**

162.    7-Eleven realleges paragraphs 1-84 above.

163.    7-Eleven and SSS Realm are parties and signatories to the 35639 Franchise Agreement.

164.    7-Eleven has complied with its obligations under the 35639 Franchise Agreement.

165.    SSS Realm has breached the 35639 Franchise Agreement's post-termination obligations by, among other things:

      G.    Failing to surrender Store 35639 and the Equipment;

      H.    Failing to transfer to 7-Eleven Store 35639's inventory; and

      I.    Failing to cease using the 7-Eleven marks and system.

166.    As a direct and proximate result of these breaches, 7-Eleven has been substantially and irreparably injured.

167.    7-Eleven is being deprived of the beneficial use of its real property and Equipment, and its business identity, customer and locational goodwill and reputation are impaired by SSS Realm's conduct and continued possession. SSS Realm is exacerbating this harm by operating and holding out its business as a 7-Eleven® store, when they are not.

168.    7-Eleven is without an adequate remedy at law to address this harm and protect its interests, and until SSS Realm is ordered to abide by the post-termination promises it made to 7-Eleven, 7-Eleven will continue to suffer substantial, irreparable injury to its business and reputation.

## COUNT XIII

**Recovery of Chattels Subject to Security Interest (24132 Franchise Agreement)**

169.    7-Eleven and realleges paragraphs 1-84 above.

170.    7-Eleven holds perfected security interests in the inventory and proceeds of Store 13999.

**COMPLAINT**

171.   The 24132 Franchise Agreement provides that, upon termination of the Franchise Agreement, SSS Realm is to assemble the Collateral and make it available to 7-Eleven at a place designed by 7-Eleven (Store 24132). Further, 7-Eleven is given the right to take possession of the Collateral in the event of Default.

172.   On March 6, 2024, 7-Eleven exercised its rights under the 24132 Franchise Agreement to discontinue financing of Store 24132's Open Account and demanded immediate repayment of any unpaid balances.

173.   7-Eleven has made demand, pursuant to the 24132 Franchise Agreement, that SSS Realm permit 7-Eleven to take immediate possession of the Store 24132's inventory and proceeds.

174.   SSS Realm has declined to voluntarily vacate Store 24132 and has wrongfully refused to turn over 7-Eleven's property (the inventory and proceeds subject to 7-Eleven's security interests).

175.   As a direct result of SSS Realm's actions as set forth above, 7-Eleven's security interests have been harmed.

176.   7-Eleven will be irreparably injured if SSS Realm is permitted to retain possession of the inventory, proceeds, and other property subject to its security interests and has no adequate remedy at law for such injuries.

177.   Pursuant to Federal Rule of Civil Procedure 64, expressly permitting this Court to order a recovery of chattels by 7-Eleven under California law and the California Commercial Code, 7-Eleven files this claim for recovery of chattels against SSS Realm who has unjustly detained all inventory, supplies, sales proceeds, equipment and fixtures of Store 24132 , in which property 7-Eleven has a valid security interest. Such property in Store 24132 is estimated to have a retail value in excess of $75,000.00.

178.   7-Eleven prays that this Court issue an order giving 7-Eleven the right to take possession of the secured property and dispose of it as necessary to preserve its value, including the inventory, merchandise, all vending supplies (including but not

limited to cups, containers and bags), receipts, the cash register fund, pre-paid operating expenses, money order blanks, bank drafts, and store supplies.

## <u>COUNT XIV</u>

**Recovery of Chattels Subject to Security Interest (34535 Franchise Agreement)**

179.   7-Eleven and realleges paragraphs 1-84 above.

180.   7-Eleven holds perfected security interests in the inventory and proceeds of Store 13999.

181.   The 34535 Franchise Agreement provides that, upon termination of the Franchise Agreement, SSS Realm is to assemble the Collateral and make it available to 7-Eleven at a place designed by 7-Eleven (Store 34535). Further, 7-Eleven is given the right to take possession of the Collateral in the event of Default.

182.   On March 6, 2024, 7-Eleven exercised its rights under the 34535 Franchise Agreement to discontinue financing of Store 34535's Open Account and demanded immediate repayment of any unpaid balances.

183.   7-Eleven has made demand, pursuant to the 34535 Franchise Agreement, that SSS Realm permit 7-Eleven to take immediate possession of Store 34535's inventory and proceeds.

184.   SSS Realm has declined to voluntarily vacate the Store 34535 and has wrongfully refused to turn over 7-Eleven's property (the inventory and proceeds subject to 7-Eleven's security interests).

185.   As a direct result of SSS Realm's actions as set forth above, 7-Eleven's security interests have been harmed.

186.   7-Eleven will be irreparably injured if SSS Realm is permitted to retain possession of the inventory, proceeds, and other property subject to its security interests and has no adequate remedy at law for such injuries.

187.   Pursuant to Federal Rule of Civil Procedure 64, expressly permitting this Court to order a recovery of chattels by 7-Eleven under California law and the California Commercial Code, 7-Eleven files this claim for recovery of chattels against SSS Realm

who has unjustly detained all inventory, supplies, sales proceeds, equipment and fixtures of Store 34535 , in which property 7-Eleven has a valid security interests. Such property in Store 34535 is estimated to have a retail value in excess of $75,000.00.

188.    7-Eleven prays that this Court issue an order giving 7-Eleven the right to take possession of the secured property and dispose of it as necessary to preserve its value, including the inventory, merchandise, all vending supplies (including but not limited to cups, containers and bags), receipts, the cash register fund, pre-paid operating expenses, money order blanks, bank drafts, and store supplies.

**COUNT XV**

**Recovery of Chattels Subject to Security Interest (35639 Franchise Agreement)**

189.    7-Eleven and realleges paragraphs 1-84 above.

190.    7-Eleven holds perfected security interests in the inventory and proceeds of Store 35639.

191.    The 35639 Franchise Agreement provides that, upon termination of the Franchise Agreement, SSS Realm is to assemble the Collateral and make it available to 7-Eleven at a place designed by 7-Eleven (Store 35639). Further, 7-Eleven is given the right to take possession of the Collateral in the event of Default.

192.    On March 6, 2024, 7-Eleven exercised its rights under the 24506 Franchise Agreement to discontinue financing of Store 35639's Open Account and demanded immediate repayment of any unpaid balances.

193.    7-Eleven has made demand, pursuant to the 35639 Franchise Agreement, that SSS Realm permit 7-Eleven to take immediate possession of Store 35639's inventory and proceeds.

194.    SSS Realm has declined to voluntarily vacate the Store 35639 and has wrongfully refused to turn over 7-Eleven's property (the inventory and proceeds subject to 7-Eleven's security interests).

195.    As a direct result of SSS Realm's actions as set forth above, 7-Eleven's security interests have been harmed.

196.   7-Eleven will be irreparably injured if SSS Realm is permitted to retain possession of the inventory, proceeds, and other property subject to its security interests and has no adequate remedy at law for such injuries.

197.   Pursuant to Federal Rule of Civil Procedure 64, expressly permitting this Court to order a recovery of chattels by 7-Eleven under California law and the California Commercial Code, 7-Eleven files this claim for recovery of chattels against SSS Realm who has unjustly detained all inventory, supplies, sales proceeds, equipment and fixtures of Store 35639, in which property 7-Eleven has a valid security interests. Such property in Store 35639 is estimated to have a retail value in excess of $75,000.00.

198.   7-Eleven prays that this Court issue an order giving 7-Eleven the right to take possession of the secured property and dispose of it as necessary to preserve its value, including the inventory, merchandise, all vending supplies (including but not limited to cups, containers and bags), receipts, the cash register fund, pre-paid operating expenses, money order blanks, bank drafts, and store supplies.

## COUNT XVI

### Ejectment (24132 Franchise Agreement)

199.   7-Eleven realleges paragraphs 1-84 above.

200.   Under the terms of the 24132 Franchise Agreement, 7-Eleven leased Store 24132's premises to SSS Realm.

201.   The 24132 Franchise Agreement, including the lease, was terminated pursuant to the validly issued and served Notice of Termination effective March 6, 2024.

202.   Upon termination of the 24132 Franchise Agreement, including the lease, SSS Realm's tenancy was terminated and SSS Realm was obligated to surrender the premises for Store 24132 and related facilities, equipment, and inventory to 7-Eleven. SSS Realm continues to occupy Store 24132 without legal right and is a trespasser.

203.   By failing to relinquish possession of Store 24132, SSS Realm is now unlawfully holding over its tenancy and is unlawfully in possession of the premises.

Accordingly, 7-Eleven is entitled to an order ejecting SSS Realm from the premises and directing SSS Realm to surrender possession of Store 24132 to 7-Eleven.

204.   As a result of SSS Realm's actions, 7-Eleven has suffered and will continue to suffer irreparable injury, including, but not limited to, the inability to exploit, use, and enjoy its real property.

205.   7-Eleven will be irreparably injured if SSS Realm is permitted to retain possession of Store 24132 and 7-Eleven has no adequate remedy at law for that injury.

## COUNT XVII

### Ejectment (34535 Franchise Agreement)

206.   7-Eleven realleges paragraphs 1-84 above.

207.   Under the terms of the 34535 Franchise Agreement, 7-Eleven leased Store 34535's premises to SSS Realm.

208.   The 34535 Franchise Agreement, including the lease, was terminated pursuant to the validly issued and served Notice of Termination effective March 6, 2024.

209.   Upon termination of the 34535 Franchise Agreement, including the lease, SSS Realm's tenancy was terminated and SSS Realm was obligated to surrender the premises for Store 34535 and related facilities, equipment, and inventory to 7-Eleven. SSS Realm continues to occupy Store 34535 without legal right and is a trespasser.

210.   By failing to relinquish possession of Store 34535 , SSS Realm is now unlawfully holding over its tenancy and is unlawfully in possession of the premises. Accordingly, 7-Eleven is entitled to an order ejecting SSS Realm from the premises and directing SSS Realm to surrender possession of Store 34535 to 7-Eleven.

211.   As a result of SSS Realm's actions, 7-Eleven has suffered and will continue to suffer irreparable injury, including, but not limited to, the inability to exploit, use, and enjoy its real property.

212.   7-Eleven will be irreparably injured if SSS Realm is permitted to retain possession of Store 34535 and 7-Eleven has no adequate remedy at law for that injury.

## COUNT XVIII

**Ejectment (35369 Franchise Agreement)**

213.   7-Eleven realleges paragraphs 1-84 above.

214.   Under the terms of the 35369 Franchise Agreement, 7-Eleven leased Store 35369's premises to SSS Realm.

215.   The 35369 Franchise Agreement, including the lease, was terminated pursuant to the validly issued and served Notice of Termination effective March 6, 2024.

216.   Upon termination of the 35369 Franchise Agreement, including the lease, SSS Realm's tenancy was terminated and SSS Realm was obligated to surrender the premises for Store 35369 and related facilities, equipment, and inventory to 7-Eleven. SSS Realm continues to occupy Store 35369 without legal right and is a trespasser.

217.   By failing to relinquish possession of Store 35369, SSS Realm is now unlawfully holding over its tenancy and is unlawfully in possession of the premises. Accordingly, 7-Eleven is entitled to an order ejecting SSS Realm from the premises and directing SSS Realm to surrender possession of Store 35369 to 7-Eleven.

218.   As a result of SSS Realm's actions, 7-Eleven has suffered and will continue to suffer irreparable injury, including, but not limited to, the inability to exploit, use, and enjoy its real property.

219.   7-Eleven will be irreparably injured if SSS Realm is permitted to retain possession of Store 35369 and 7-Eleven has no adequate remedy at law for that injury.

## COUNT XIX

**Breach of Franchise Agreements – Damages (24132 Franchise Agreement)**

220.   7-Eleven realleges paragraphs 1-84 above.

221.   7-Eleven has complied with its obligations under the 24132 Franchise Agreement.

222.   In the 24132 Franchise Agreement, SSS Realm agreed, among other things, to:

A.   Provide 7-Eleven with truthful, accurate and complete information;

B.   Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System (as defined in the Franchise Agreement);

C.   Devote its best efforts to the business of Store 24132 and maximization of Store 24132's sales and gross profit, and cause the Store to be operated only pursuant to the 7-Eleven System and in a manner that would enhance the 7-Eleven Image;

D.   Properly record sales inventory at the time of sale; and

E.   Pay its open account balance upon the discontinuance of 7-Eleven's financing.

223.   SSS Realm breached each of its above obligations in the 24132 Franchise Agreement, causing 7-Eleven to suffer damages.

## COUNT XX

**Breach of Franchise Agreements – Damages (34535 Franchise Agreement)**

224.   7-Eleven realleges paragraphs 1-84 above.

225.   7-Eleven has complied with its obligations under the 34535 Franchise Agreement.

226.   In the 34535 Franchise Agreement, SSS Realm agreed, among other things, to:

A.   Provide 7-Eleven with truthful, accurate and complete information;

B.   Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System (as defined in the Franchise Agreement);

C.   Devote its best efforts to the business of Store 34535 and maximization of Store 34535's sales and gross profit, and cause the Store to be operated only pursuant to the 7-Eleven System and in a manner that would enhance the 7-Eleven Image;

D.   Properly record sales inventory at the time of sale; and

E.      Pay its open account balance upon the discontinuance of 7-Eleven's financing.

227.    SSS Realm breached each of its above obligations in the 34535 Franchise Agreement, causing 7-Eleven to suffer damages.

## COUNT XXI

**Breach of Franchise Agreements – Damages (35639 Franchise Agreement)**

228.    7-Eleven realleges paragraphs 1-84 above.

229.    7-Eleven has complied with its obligations under the 35639 Franchise Agreement.

230.    In the 35639 Franchise Agreement, SSS Realm agreed, among other things, to:

A.      Provide 7-Eleven with truthful, accurate and complete information;

B.      Not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System (as defined in the Franchise Agreement);

C.      Devote its best efforts to the business of Store 35639 and maximization of Store 35639's sales and gross profit, and cause the Store to be operated only pursuant to the 7-Eleven System and in a manner that would enhance the 7-Eleven Image;

D.      Properly record sales inventory at the time of sale; and

E.      Pay its open account balance upon the discontinuance of 7-Eleven's financing.

231.    SSS Realm breached each of its above obligations in the 35639 Franchise Agreement, causing 7-Eleven to suffer damages.

## COUNT XXII

### Breach of Guaranty (24132 Guaranty)

232.    7-Eleven realleges paragraphs 1-84 above.

233.    Mr. Sandhu executed the 24132 Guaranty in favor of 7-Eleven.

234.   Under the 24132 Guaranty, Mr. Sandhu unconditionally and absolutely guaranteed the prompt and fully payment of liability of SSS Realm under the 24132 Franchise Agreement and the performance of all obligations by SSS Realm under the 24132 Franchise Agreement.

235.   SSS Realm breached the 24132 Franchise Agreement, and Mr. Sandhu breached the 24132 Guaranty by failing to honor its terms, including by his failure to pay the amounts owing to 7-Eleven and failing to abide by the post-termination obligations.

236.   7-Eleven has been damaged by Mr. Sandhu's breaches of the 24132 Guaranty.

## COUNT XXIII

### Breach of Guaranty (34535 Guaranty)

237.   7-Eleven realleges paragraphs 1-84 above.

238.   Mr. Sandhu executed the 34535 Guaranty in favor of 7-Eleven.

239.   Under the 34535 Guaranty, Mr. Sandhu unconditionally and absolutely guaranteed the prompt and fully payment of liability of SSS Realm under the 34535 Franchise Agreement and the performance of all obligations by SSS Realm under the 34535 Franchise Agreement.

240.   SSS Realm breached the 34535 Franchise Agreement, and Mr. Sandhu breached the 34535 Guaranty by failing to honor its terms, including by his failure to pay the amounts owing to 7-Eleven and failing to abide by the post-termination obligations.

241.   7-Eleven has been damaged by Mr. Sandhu's breaches of the 34535 Guaranty.

## COUNT XXIV

### Breach of Guaranty (35639 Guaranty)

242.   7-Eleven realleges paragraphs 1-84 above.

243.   Mr. Sandhu executed the 35639 Guaranty in favor of 7-Eleven.

244.   Under the 35639 Guaranty, Mr. Sandhu unconditionally and absolutely guaranteed the prompt and fully payment of liability of SSS Realm under the 35639

Franchise Agreement and the performance of all obligations by SSS Realm under the 35639 Franchise Agreement.

245.  SSS Realm breached the 35639 Franchise Agreement, and Mr. Sandhu breached the 35639 Guaranty by failing to honor its terms, including by his failure to pay the amounts owing to 7-Eleven and failing to abide by the post-termination obligations.

246.  7-Eleven has been damaged by Mr. Sandhu's breaches of the 35639 Guaranty.

## PRAYER FOR RELIEF

**WHEREFORE**, 7-Eleven respectfully pray for the following relief against Defendants:

A.    An order preliminarily and permanently enjoining Defendants, their agents, servants and employees, and those people in active concert or participation with them, from:

    1.    Using the 7-Eleven marks or any trademark, service mark, logo or trade name that is confusingly similar thereto;

    2.    Otherwise infringing upon 7-Eleven's marks or using any similar designation, alone or in combination with any other components;

    3.    Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of Defendants' business, goods, or services; and

    4.    Causing a likelihood of confusion or misunderstanding as to Defendants' affiliation, connection, or association with 7-Eleven and its franchisees or any of their goods and services.

B.    An order, pursuant to 15 U.S.C. § 1118, that all labels, signs, prints, packages, wrappers, receptacles, uniforms, logo items, and advertisements in the possession of Defendants, their affiliates, subsidiaries, officers, agents, servants and employees, and those people in active concert or participation with them bearing 7-

Eleven's marks, and all plates, molds, and other means of making the same, if any, be delivered to 7-Eleven at Defendants' cost;

C.    An order requiring Defendants to eliminate their advertising under 7-Eleven's marks or any other confusingly similar designations from all media including, but not limited to, websites, newspapers, flyers, coupons, promotions, signs, telephone books, telephone directory assistance listings and mass mailings, all at Defendants' cost;

D.    An order requiring Defendants to file with the Court and to serve upon 7-Eleven's counsel within thirty (30) days after entry of an injunction or order, a written report, under oath, setting forth in detail the manner in which they have complied with such injunction or order;

E.    An award and judgment for damages, including all damages caused by Defendants' breaches of contract and Lanham Act violations;

F.    An award and judgment for all the profits earned by Defendants through their trademark infringement, trademark dilution, and unfair competition, as provided by the Lanham Act;

G.    A preliminary and permanent injunction directing that Defendants surrender possession and be ejected from the premises and facilities at (1) 17920 S. Avalon Boulevard in Carson, California  90746, (2) 8600 S. Central Avenue in Los Angeles, California  90002, and (3) 1800 E. Slauson Avenue in Los Angeles, California  90058 and permitting 7-Eleven to assume operation of the Stores pending a trial on the merits of the case;

H.    A preliminary and permanent injunction directing Defendants to assemble and surrender possession of the inventory and proceeds of the Stores at (1) 17920 S. Avalon Boulevard in Carson, California  90746, (2) 8600 S. Central Avenue in Los Angeles, California  90002, and (3) 1800 E. Slauson Avenue in Los Angeles, California 90058;

I.    A judgment ejecting Defendants from the premises at (1) 17920 S. Avalon Boulevard in Carson, California  90746, (2) 8600 S. Central Avenue in Los Angeles,

California  90002, and (3) 1800 E. Slauson Avenue in Los Angeles, California  90058; and

     J.     Judgment in favor of 7-Eleven and against Defendants for the costs and expenses, including reasonable attorneys' fees, incurred by 7-Eleven in connection with this action as provided for by statute and the Franchise Agreements; and

     K.     Such other relief as this Court deems just and proper.

Dated:  March 6, 2024     Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/ James F. Speyer*

JAMES F. SPEYER

Attorneys for Plaintiff 7-Eleven, Inc.

Email:James.Speyer@arnoldporter.com